IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


DONALD FAUVER                                    PLAINTIFF

VS.                        CIVIL ACTION NO. 5:15-cv-49(DCB)(MTP)

SEADRILL AMERICAS, INC.                           DEFENDANT


<u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on the defendant Seadrill
Americas, Inc. ("Seadrill")'s Motion for Summary Judgment **(docket
entry 43)**. Also before the Court is a Motion in Limine filed by
Seadrill **(docket entry 50)**. Having carefully considered the
motions, the plaintiff's response to the motion for summary
judgment, the memoranda of the parties, and the applicable law, the
Court finds as follows:

In this maritime personal injury action under the Jones Act
(46 U.S.C. § 30104)(formerly 46 U.S.C. § 688), the plaintiff,
Donald Fauver ("Fauver"), a former member of the crew of the
offshore drilling rig M/V WEST PEGASUS ("WEST PEGASUS"), seeks
damages for the alleged failure of his employer, Seadrill, to
transport him promptly to shore for medical treatment, after he
reported chest pains and dizziness on the rig. Seadrill disputes
there was an avoidable delay in taking the plaintiff to the
hospital, and disputes that it was otherwise negligent; however,
that is not the issue raised in its motion for summary judgment.
Rather, the defendant's motion is based solely on its claim that

there is a complete absence of competent medical evidence that the defendant's alleged negligence was in any way a cause of the plaintiff's subsequent heart attack and alleged disability.

According to the defendant, both the plaintiff and his treating physician have certified that plaintiff's condition does not arise out of his employment with defendant. Therefore, Seadrill asserts, in the absence of such causation evidence, the plaintiff cannot prevail at trial and his claims must be dismissed with prejudice as a matter of law.

I. Facts

On June 5, 2012, the plaintiff was working as a mechanic aboard the WEST PEGASUS, a semi-submersible drilling rig which was then operating in the territorial waters of Mexico. At approximately 8:00 a.m. that day, Fauver reported that he was having chest pains and had fainted in his quarters. He was able to walk under his own power to the rig infirmary where the on-board medic took his blood pressure and performed the first of a series of EKGs, all of which were normal. The medic prepared a written report which was sent electronically to NuPhysicia – a physician's group based in Houston, Texas, contracted by Seadrill to provide remote medical care and advice. Shortly thereafter, the medic consulted by videoconference with NuPhysicia's Dr. Barry Diner.

Although at that time Fauver was not in any acute distress, Dr. Diner recommended that he be taken off the rig. Fauver then

walked without assistance from the medic's office to his quarters and packed his bags while the necessary arrangements for transporting him were made. The plaintiff was taken by helicopter to shore in Mexico, and from there flown by chartered airplane to Brownsville, Texas, then transported by ambulance to Valley Regional Medical Center in Brownsville, Texas, located just over the Mexican border. He was accompanied throughout by the rig medic.

Fauver arrived at Valley Regional at approximately 4:11 p.m. The rig medic remained with him for approximately one hour after arrival. The plaintiff was stable during that time, so no urgent care was provided by the hospital staff. Nor was Fauver transferred to the hospital's cardiac or intensive care unit, but was simply kept under observation. Six hours after the plaintiff's arrival at Valley Regional, during which time he had been in no acute distress and had been in the exclusive care of hospital personnel, he inexplicably went into cardiac arrest and had to be resuscitated. He was thereafter treated at Valley Regional and discharged within a few days after insertion of a stent in a cardiac artery.

The plaintiff was subsequently placed under the care of Dr. George Reynolds, a cardiologist who had previously treated Fauver for an earlier heart problem prior to the June 2012 incident on the rig. Dr. Reynolds followed the plaintiff's progress for several

months and on December 20, 2012, released him to return to his normal work without any physical restriction whatsoever.

The plaintiff claims that he continues to have cardiac problems.  In his lawsuit he alleges specifically that the time which passed between when the decision was made to remove him from the rig and the time he arrived at Valley Regional in Brownsville was the cause of his heart attack and of ongoing heart problems which the plaintiff claims are permanently disabling, notwithstanding the fact that the ambulance that transported him to the hospital did so on a non-emergency basis, and notwithstanding the fact that he was in stable condition in the hospital for six hours before the attack occurred.

The plaintiff's employment with the defendant ended in May of 2014.  In late July and early August of 2014, both the plaintiff and the plaintiff's treating physician provided statements to the plaintiff's disability carrier.  In these statements, they both certified that Fauver's condition did not arise out of the plaintiff's employment with the defendant.

## II. Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex v. Catrett, 477 U.S. 317 (1986).  To avoid summary judgment, a plaintiff must produce evidence of "specific facts showing the existence of a

genuine issue for trial." <u>Foulston Siefkin LLP v. Wells Fargo Bank of Texas N.A.</u>, 465 F.3d 211, 214 (5th Cir. 2006). A factual issue is "material" only if its resolution could affect the outcome of the action. <u>Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.</u>, 482 F.3d 408, 411 (5th Cir. 2007). A plaintiff cannot resist summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994)(<u>en banc</u>).

## III. Causation

In order to prevail on the issue of medical causation in a Jones Act case, the plaintiff must present expert medical evidence that there is more than a mere possibility that a causal relationship exists between a Jones Act employer's alleged negligence and a seaman's alleged injury.[1] In order to prevail at trial, the plaintiff must show not only that there was an avoidable delay, <u>i.e.</u> that Seadrill was negligent, but also that this delay caused his subsequent heart attack, meaning that without the delay

---

[1] <u>Johnson v. Horizon Offshore Contractors, Inc.</u>, 2008 WL 916256, at *4 (E.D. La. Mar. 31, 2008); <u>Hancock v. Diamond Offshore Drilling, Inc.</u>, 2008 WL 3501015, at *1 (E.D. La. Aug. 8, 2008); <u>Moore v. Chesapeake & Ohio Ry. Co.</u>, 340 U.S. 573, 578 (1951)("Speculation cannot supply the place of proof."); <u>Mayhew v. Bell S.S. Co.</u>, 917 F.2d 961, 964 (6th Cir.1990)(holding that in a Jones Act negligence case, "a medical expert must be able to articulate that it is likely that the defendant's negligence, or more than possible that the defendant's negligence, had a causal relationship with the injury and disability for which the plaintiff seeks damages); <u>Young v. Illinois Cent. R. Co.</u>, 941 F.2d 1212 (7th Cir. 1991)(holding that the possibility of a causal link between the plaintiff's injuries and the railroad's negligence is not probative evidence of causation).

it is more likely than not the heart attack would not have occurred.[2]

With respect to medical causation in a Jones Act case, the Fifth Circuit has clearly defined the test: "In a Jones Act case, a seaman has the burden of proving by medical testimony that his injuries were due to the defendant's negligence." Johnson, 2008 WL 916256 at *4 (citing Ginter v. Sea Support Services L.L.C., 2001 WL 1602154 (E.D. La. Dec. 12, 2001)).

The Court's Scheduling Order in this case required the plaintiff to designate the experts he will call at trial on or before December 1, 2015.  In addition, the plaintiff was required to provide a report from the experts so designated, summarizing the experts' views and anticipated testimony.  On December 1, 2015, plaintiff served on defense counsel a designation of Dr. Lucius M. Lampton as an expert in this case.  The designation consisted merely of counsel's description of Dr. Lampton's qualifications (who, notably, is only a "family medicine" physician, not a cardiologist, and therefore is not per se qualified to opine on matters within the cardiology specialty), and counsel's summary of Dr. Lampton's anticipated testimony.  No report from Dr. Lampton

---

[2] In a Jones Act case such as this, the plaintiff must show that (1) a duty was owed by the defendant to the plaintiff; (2) breach of that duty; and (3) a causative link between that breach and damages sustained by the plaintiff.  Under the Act, an employer is liable if its negligent breach of duty caused the seaman's injury.  See Moore v. Omega Protein, Inc., 459 F. App'x 339, 341 (5th Cir. 2012).

was ever produced.

In addition, even plaintiff's counsel's summary of the anticipated testimony from Dr. Lampton (who has never seen the plaintiff) is not enough to establish causation.  The designation recites that:

> Dr. Lampton will testify that the electrocardiogram and other laboratory tests available in a hospital setting should have been provided [plaintiff] promptly, and a failure to provide prompt and adequate medical care would typically adversely affect the extent of any damage to the heart muscle caused by a myocardial infarction.

Designation of Dr. Lampton (Exhibit C to defendant's motion).

There is no representation by the plaintiff that Dr. Lampton is of the opinion that the time which passed before Fauver was delivered to the hospital was the cause of his heart attack six hours after his arrival.  Rather, Dr. Lampton's presumed testimony (as a family doctor and not as a cardiologist), is simply that the failure to provide prompt medical cared would "typically" adversely affect a heart patient.  Such a generic statement does not establish a prima facie case of medical causation, without which the plaintiff cannot recover as a matter of law.  Furthermore, this purported testimony does not even reach the level of speculation or conjecture, which still would be insufficient.

As noted above, after his heart attack in Texas the plaintiff returned to the care of Dr. George Reynolds.  Dr. Reynolds was not timely designated as an expert.  He was, however, so designated by plaintiff's counsel on February 5, 2016 although, again, the

7

designation did not include a written report from Dr. Reynolds but only counsel's summary of his anticipated testimony.  Designation of Dr. Reynolds (Exhibit D to defendant's motion).

Dr. Reynolds was deposed on December 4, 2015,[3] and was questioned on the issue of causation.  Critically, he never expressed the view that in his professional medical judgment it is more likely than not that the time which passed in transporting the plaintiff to the hospital caused the plaintiff's heart attack sustained six hours later; nor did Dr. Reynolds opine that any of Fauver's alleged injuries were caused by any alleged delay.

Further, by his own admission, Dr. Reynolds did not have the background information regarding plaintiff's transportation to the hospital that would be necessary for him to form a view on the issue of medical causation:

> Q: Okay. One of the allegations in this case, Dr. Reynolds, is that Mr. Fauver was not taken to the hospital promptly enough.  Do you feel that you have enough information right now one way or another to have an opinion about that?
>
> A: Well, just in general, if - you know - you know, coronary diseases are our biggest killer of, especially males, and that the scenario of severe chest pain and then true syncope enough that you don't protect yourself, you fall and hurt yourself, is usually a sign of something serious going on.  You do not always have to have EKG changes, but I'm not sure - I don't have any access to EKGs or anything like that and - but it's just the clinical feel, and it depends upon the communication

---

[3] The defendant does not waive any objection it may have as to Dr. Reynolds' trial testimony on grounds that he was not timely designated and has never produced a written report.  The defendant's present motion, however, is not based on such objections.

between the outlying place and the - and the treating place, the flavor they get as far as the severity and the urgency to get from point A to point B and the potential - potential care that may be given during that time frame.

Q: Right.

A: You know, if you get a - usually, you know, if there's any question something acute cardiac is going on, time is muscle.  And sometimes, unfortunately, the - and for later stuff with him, sometimes it's not always - it doesn't - sometimes the muscle stuff shows up later and not sooner and -

Q: But aside from the generalities, I'm really talking about this particular patient.  Do you feel that you're able to render any opinion about how his medical course might have been impacted by things that happened on the day of the incident, June 5, 2012, and - and do you know enough to have an opinion?

A: Well, you know, I was not there, I didn't know exactly what he looked like, whether he was sweaty or pale or how out he went, you know, how long he was out and symptomology, so it's difficult to give a specific recommendation, but in general, it you have something like this go on, the quicker you get to somebody the better.

Q: Sure, but you don't know - from what you just said, you don't know the symptoms that he had when he was on the rig.  You don't know what medical treatment might have been provided to him on the rig, you don't know what the results of EKGs were.

A: No.

Q: You don't know how long he was in the hospital before he had the fibrillation event.  You don't know any of those things?

A: I think he - just glancing through this, I - I'm not sure if he was still - let's see - whether he was still in the emergency room in Brownsville when he fibrillated or not, but we - in retrospect, you know, this retrospect is 20/20.  Most likely the syncope was an arrhythmia, but, thankfully, it was a spontaneous - of course, no one

can know that being - you know, being fair, nobody would
know that for sure, but it would be something to be very
worrisome, but I'm a cardiologist, and I hear this story
and go uh-oh, you know, that - you know, something is
going on.  You've got to be monitored and stuff and get
him here as fast as possible.

Q: All right. As you sit here now, do you have any idea
how long he was in the hospital in Brownsville before he
had the fibrillation event?

A: No, sir.

Q: Okay. If I told you that it was six hours that he was
in the hospital before he had the fibrillation event,
would that surprise you?

A: I wouldn't be surprised by anything at this stage of
the game, but I think he was just very fortunate if he
had had the previous - first episode was Vtach, and then
the - and if he - and which could have correlated, you
know, to a - you know, when a muscle that's not used to
not having blood, and it doesn't have blood, it gets
really unhappy, and one of the things that manifest is
rhythm problems, and in retrospect, it's probably related
to an occlusion, not quite occluded, occlusion that
triggered some of his symptoms and the arrhythmias.  And
I'm not - and I think he was just being looked at after,
you know, not by people during that time frame because he
could have fibrillated at any point at that point of a
reclosed artery again, but then when they looked shortly
thereafter, the vessel was opened, but it showed evidence
for a rupture, and it wasn't as a big a clot burden at
that point.  So it's just - yeah, it's hard, you know,
three years after the fact without being there or being
on the - on the other end of the telephone or the - or
however - whatever communication they would have.

Q: Well, that's really my point, and I just - I'm trying
to understand, and so I can help the jury understand,
whether you feel you have enough information to form an
opinion on this issue one way or the other.  The issue
being the timeliness of medical care, and I'm hearing you
say that you haven't had a chance to review all of the
hospital records, and you haven't had the chance to
review the EKG that was done in the hospital.  There was
also an EKG done in the ambulance that took him to the
hospital and an EKG done on the rig, all of which were

10

normal.

A: Okay.

Q: And you have not had the opportunity to view those, as I appreciate it.

A: Right.

Q: And so I'm understanding you to say that on the basis of the limited information you have, you're not in the position to express an opinion one way or the other about the timeliness of his care.

A: Again, yeah, I would have to say yes to that because it depends - you know, if I had been there, I would have had a better idea about the flavor -

Q: Sure.

A: - and put 30 years of doing this in the thing and say what I think is going on, I mean, whether or not the time frame was appropriate.

Deposition of Dr. Reynolds (Exhibit B to defendant's motion).

Later, when being cross-examined by plaintiff's counsel, Dr. Reynolds was asked a long hypothetical question in which he was asked to assume a number of things. The defendant contends that those assumptions are not based on facts in evidence; however, the issue for purposes of the defendant's present motion is whether Dr. Reynolds ever positively expressed the view that the alleged negligent delay in transporting plaintiff to the hospital played even a minor part in causing the plaintiff's subsequent heart attack. The pertinent exchange with plaintiff's counsel was as follows:

Q: Doctor, I want to ask you to give me an opinion, please, sir, based on a reasonable degree of medical

certainty. Is it your opinion ... that the delay, if any, that I described to your earlier from the syncopal event on the morning of June 5th, until the events later that day at the hospital in Brownsville, the Valley Regional Medical Center, is it your opinion that any delay emergently taking my client off the West Pegasus and to appropriate medical care played any part, even a slight part, in the condition that you are now treating my client for?

A: This is - this is difficult to say for sure.  The potential for a catastrophe was there with the delay. The fact that he did not have a catastrophe during all of those hours, you know, from the initial event to later when he - when he manifested for sure what was going on would have been deadly.  Whether - since it was one of these stuttering type of things, he's had severe pain off and on, it's hard to say, you know, with great certainty that whether there was enough time of little or no flow when he was having his pain, and then it would get better and stuff, that it - that it made him have more patchy heart damage.  The - the longer period of time that he was having symptoms would maybe have led to perhaps a little more of this, but it did not manifest much on EKG or the - or the echoes.  But, now, after the fact, it was some suggestion that there was some damage, but it's pure speculation in that regard.  But the biggest thing was that he was at significant risk in retrospect with the delay of having a fatal arrhythmia, which, thank the Lord, he did not have.  But, again, you know, it's hard - it's hard to say for sure, and the hard data we've got is real soft data.  You know, we've got the filling pressure, the slow flow, and then we - I will say why does it look like that, and it's a territory where a problem was, so you would have to assume there was something different about that part of his muscle than the other parts of his heart, and the most likely thing is he has some patchy areas of damage out there.

Q: And is it your opinion whether or not that delay that I've described may have played a slight part in the damage that he has sustained?

A: If we go slight, I can say, you know, it could have played a role, not did, but could have, but the main thing was what didn't happen that was the risk. The - going back, what ended up - what they had initially on their - on their cath when they did him was they showed

that the front wash, which was a tip didn't move this way
(indicating).  It moved that way (indicating), so that
part of his heart was definitely stunned at the time of
the cath, and the degree of stunning, it can be related
to the amount of time that even a one continuous, but
intermittent period of time, but that's - that's, you
know, just looking at what I had saw on their cath report
and their drawing that helped localize that this was
something going on, but - but, anyway, it's tough to say,
but it could be a cause and could play in some long-term
act.  It has to be - you know, could - could is yes, but
is it - did it for sure, I can't say for - say that,
because I wasn't there taking care of him.

Q: (By Mr. Dowdy) And I'm not asking you to say for sure,
but based on what you know, I'm asking you could that
delay that has been described have played a slight part
in the damage that you have described?

A: Yes.

Deposition of Dr. Reynolds (Exhibit B to defendant's motion).

It is not enough, in order to establish a prima facie case of

medical causation, for Dr. Reynolds to say merely that the alleged

delay in transporting plaintiff to the hospital "... could have

played a role, not did, but could have ...."  At most, Dr.

Reynolds' testimony establishes that it is "a mere possibility"

that the defendant's negligence caused the plaintiff's injury.

This is insufficient to withstand summary judgment.

In Johnson, a seaman-plaintiff asserted a Jones Act negligence

claim against his employer-defendant, claiming that a failure to

provide proper medical care resulted in a heart condition.  2008 WL

916256 (E.D. La. March 31, 2008).  The defendant's expert

cardiologist was of the opinion that the plaintiff's heart

condition could not be related to any alleged negligence on the

part of the defendant. Id. at *2. The plaintiff did not produce an expert report from a cardiologist to address or contest the defendant's expert cardiologist. Id. at *3. The Johnson court stated that the defendant was entitled to summary judgment if the plaintiff failed to provide any proof of his claim regarding an alleged failure to provide medical care. Id. at *4. The plaintiff argued that the defendant's expert cardiologist noted that there was a temporal relationship between the plaintiff's onset of viral-type symptoms and his heart condition, but even this was insufficient to survive summary judgment. Id. The court noted that the plaintiff had the burden of proving by medical testimony that his injuries were due to the defendant's negligence, and that the plaintiff had provided no evidence to show the causal connection between his illness and his work for the defendant. Id. at *5. "Speculation and conjecture" were insufficient to show that there was more than a mere possibility that a causal relation existed between the defendant's alleged negligence and the plaintiff's alleged injury. Id. The plaintiff simply failed to put forth any evidence indicating that his condition was worsened by any alleged inadequate care. Id. There was no expert report or evidence to support the plaintiff's claim, and the defendant provided an expert report from a cardiologist who was of the opinion that the alleged injuries could not be related to any alleged negligence of the defendant. Id. Therefore, the plaintiff

14

could not prevail on his Jones Act negligence claim as a matter of law, and summary judgment was warranted and granted. Id. at *6.

In Hancock v. Diamond Offshore Drilling, Inc., a seaman-plaintiff claimed that his employer-defendant failed to provide immediate and adequate medical care and that this resulted in physical injuries. 2008 WL 3501015, at *1 (E.D. La. Aug. 8, 2008). The Hancock court noted that a seaman has the burden of proving by medical testimony that his injuries were due to the defendant's negligence. Id. at *4. Citing Johnson, the Hancock court ruled that a Jones Act seaman's medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages. Id. All of the plaintiff's treating physicians were deposed, and each refused to state affirmatively that the alleged delay between the onset of the plaintiff's symptoms and his departure from the defendant's vessel played any part in exacerbating plaintiff's illness or necessitating surgery. Id. One of the physicians conceded that he could not render an opinion to a reasonable degree of medical probability as to whether the plaintiff's delay in obtaining medical attention caused the plaintiff's need for surgery. Id. Another treating physician refused to provide an opinion as to whether the delay in getting the plaintiff off the drilling rig, more probably than not, was a cause of plaintiff's ultimate

15

physical condition. Id. That physician also testified that to render such an opinion would be "pure speculation." Id. The plaintiff's IME physician testified that any delay between plaintiff's first becoming symptomatic and his leaving the rig had no impact on the course of his disease or the necessity of surgery. Id. Finally, the plaintiff's treating gastroenterologist testified that he could not, with a degree of reasonable medical probability, state that plaintiff would not have had to undergo surgery had he sought treatment earlier and that to render such an opinion would be "[p]ure speculation." Id. The Hancock court held that there was no medical evidence that any alleged delay in treatment on board the vessel had any adverse impact on the course of the plaintiff's disease. Id. Because no physician testified as to any causal relationship between the defendant's alleged conduct and the plaintiff's eventual medical condition, the plaintiff could not prove causation. Id. Therefore, the defendant was entitled to and was granted summary judgment. Id. at *5.

Seadrill contends that the Court should grant its motion for summary judgment for the same reasons addressed in Johnson and Hancock. If the plaintiff has no evidence establishing medical causation, then it follows necessarily that he cannot establish an essential part of his claim, and, further, that he cannot present a prima facie case of liability against the defendant. Thus, Seadrill asserts it is entitled to a judgment as a matter of law.

16

IV. Admissions

In addition, the defendant states that both the plaintiff and his treating cardiologist, Dr. Reynolds, certified that the plaintiff's condition did not arise out of the plaintiff's employment with Seadrill.  Attending Physician's Statement and Employee's Statement (collectively Exhibit E to defendant's motion).  The plaintiff's employment with Seadrill ended in May of 2014.  In late July and early August of 2014, the plaintiff applied for disability benefits with Sun Life Assurance Company of Canada. The application process required that both plaintiff and Dr. Reynolds provide certified statements.  In the Attending Physician's Statement, Dr. Reynolds affirmatively stated that plaintiff's condition was not due to injury or sickness arising out of his patient's employment.  On August 4, 2014, Dr. Reynolds signed his statement.  The following was directly above his signature line:  "I certify that the above statements are true and correct."  In the Employee's Statement, the plaintiff also affirmatively stated that his condition was not related to his job. On July 30, 2014, the plaintiff signed his statement.  Also directly above his signature line was the following: "I certify that the above statements are true and correct."  Seadrill claims that the certified statements lend further support for the conclusion that the plaintiff cannot claim that his condition arises out of his employment with Seadrill, and that Seadrill is

17

entitled to summary judgment as a matter of law.

<u>V. The Defendant's Expert Medical Evidence</u>

Although in order to prevail on its motion for summary judgment, the defendant need only demonstrate the absence of evidence supporting an essential element of plaintiff's claim, Seadrill also offers affirmative proof that there is no causative link between its alleged negligence and the plaintiff's subsequent heart problems.   A board-certified cardiologist retained by Seadrill, Dr. Antoine Rizk, whose Expert Report was timely provided to the plaintiff, has stated positively that the time which passed between Fauver's initial complaints on the rig and his arrival at the hospital in Brownsville had nothing to do with his heart attack six hours later, or with his subsequent cardiac problems.   In his Report, Dr. Rizk concludes:

> ... based on my review of the pertinent medical records and depositions, it is my expert opinion that the time which passed between Mr. Fauver's initial complaints on the rig and his arrival at the hospital in Brownsville had nothing to do with the ventricular fibrillation he experienced six hours after arrival or to his subsequent cardiac problems.  The treatment and the attention that the plaintiff received on the rig and during his transfer to the hospital was appropriate.  His condition was very stable during the six hours immediately after he arrived at the hospital.  In my opinion, his medical course would have been precisely the same even if he had arrived at the hospital hours before he did.

Declaration of Antoine B. Rizk, M.D. (Exhibit A to defendant's motion).  Coupled with the absence of causation evidence from the plaintiff, the report from Dr. Rizk leaves no doubt that the

plaintiff cannot prevail on an essential component of his case, causation.

The law is clear that a plaintiff must present medical causation evidence that goes beyond mere possibilities. The medical causation testimony presented by the plaintiff is merely that the alleged negligence possibly could have, not that it did, play a part in causing his injuries.

In the absence of proof that the defendant's alleged negligence was a cause of the plaintiff's heart attack and subsequent medical problems, the plaintiff cannot recover. No such proof has been tendered and the deadline for doing so has passed. Furthermore, the plaintiff and his treating physician have certified that the plaintiff's condition does not arise out of his employment with the defendant.

Since the plaintiff cannot make out a prima facie case of liability, the Court finds that the defendant is entitled to summary judgment in its favor, and dismissal of the plaintiff's claims with prejudice.

Because the defendant is entitled to summary judgment, the defendant's motion in limine is moot.

Accordingly,

IT IS HEREBY ORDERED that defendant Seadrill's Motion for Summary Judgment **(docket entry 43)** is GRANTED;

FURTHER ORDERED that defendant Seadrill's Motion in Limine

19

**(docket entry 50)** is MOOT;

A Final Judgment dismissing this action with prejudice shall follow.

SO ORDERED, this the 28th day of July, 2016.


/s/ David Bramlette
UNITED STATES DISTRICT JUDGE